1
2
3
4
5          **UNITED STATES DISTRICT COURT**
6          **DISTRICT OF NEVADA**
7
8  DAVID CISMARU,                           )
9              Plaintiff,                   )   Case No. 2:14-CV-01432-RFB-GWF
                                            )
10 vs.                                      )   **FINDINGS AND**
                                            )   **RECOMMENDATION**
11 CAROYN W. COLVIN, Acting Commissioner,   )
   Social Security Administration,          )
12                                          )
              Defendant.                    )
13 _____      )

14         This matter is before the Court on Plaintiff David Cismaru's Complaint for Review of

15 Final Order of the Commissioner of Social Security (#3), filed on September 8, 2014.  The

16 Acting Commissioner filed her Answer (#10) on November 17, 2014.  Plaintiff filed his Motion

17 for Reversal and Remand (#16) on January 16, 2015.  The Acting Commissioner filed her

18 Opposition to Plaintiff's Motion for Remand and Cross-Motion to Affirm the Agency's Decision

19 (#22, #23) on April 20, 2015.   Plaintiff did not file a reply brief.

20                              **BACKGROUND**

21         **A.       Procedural History.**

22         Plaintiff David Cismaru filed an application for disability insurance benefits under Title II

23 of the Social Security Act on September 19, 2011, alleging that he became disabled on April 25,

24 2010.  *See* Administrative Record ("AR") 199-205.  He filed an application for supplemental

25 security income on September 21, 2011.  AR 193-198. The Commissioner denied Plaintiff's

26 application initially and on reconsideration.  AR 116-128, 129-141, 144-147, 148-152.  On April

27 25, 2012, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 163-

28 164.   Prior to the hearing, Plaintiff amended his application to request a closed period

1   of disability from April 26, 2010 to February 11, 2012.  AR 231, 301.  The hearing before the

2   ALJ was conducted on January 9, 2013.  AR 77-113.  The ALJ issued his decision on February

3   20, 2013 and concluded that Plaintiff was not disabled from April 25, 2010 through the date of

4   the decision.  AR 46-55.  Plaintiff's request for review by the Appeals Council was denied on

5   July 22, 2014, AR 2-14, and he filed this action for judicial review pursuant to 42 U.S.C. §

6   405(g).  This matter has been referred to the undersigned for a report of findings and

7   recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

8          **B.     Factual Background.**

9          Plaintiff David Cismaru was born on April 1, 1961.  He is 5'6" tall and weighed 272

10   pounds at the time of the January 9, 2013 hearing.  AR 90.  The ALJ noted that medical records

11   indicated Mr. Cismaru's weight ranged from 250 to 270 pounds.  AR 91.  Mr. Cismaru was

12   married to Maryia Melnikava from 2008 until 2011.  AR 84-86, 300.  He does not have children.

13   He has a college degree with a major in telecommunications and a minor in merchandising.  AR

14   86.

15          Mr. Cismaru operated an indoor tanning salon business in Texas from May 1987 until

16   January 2005 or July 2009.[1]  AR 257, 235, 245, 297.  He worked in the tanning salon business

17   eight hours a day, six days a week.  AR 258.  Mr. Cismaru's ex-wife stated that after Plaintiff's

18   two knee surgeries (in late 2005/early 2006), he never worked in the tanning salon business again.

19   He instead let his employees run the business until he sold it prior to moving to Las Vegas.  AR

20   300.  Plaintiff's mother stated that he moved to Las Vegas in 2009.  AR 299.  Mr. Cismaru

21   worked forty hours per week as a telephone support representative for Sitel Operating Corp. from

22   September 2009 to April 25, 2010.  AR 235, 245.  Mr. Cismaru testified that he provided

23   telephone customer service for Sony Entertainment Corporation.  AR 89.  He was terminated

24   from this employment.  AR 245.  His employer told him that he was being fired because the

25   intonation in his voice came across as rude to consumers.  Mr. Cismaru stated that the tone of his

26   

27          [1] Mr. Cismaru's October 26, 2011 Work History Report stated that he operated the tanning salon
    until January 2005 when he had surgery.  AR 257, 264.  The other work history and disability reports state

28   that he operated the tanning salon until July 2009.

1   voice was due to his chronic pain.  AR 100-101.  Mr. Cismaru's ex-wife stated that Plaintiff

2   lasted about 6 months in this employment and was ultimately let go because he was constantly

3   missing work due to chronic leg pain and because he was not able to sit for the eight hour shifts

4   without lying down.  AR 300.

5       Mr. Cismaru testified at the January 9, 2013 hearing that he was currently working part-

6   time as a telephone customer service representative for Ancestry.com.  AR 107-108.  He was able

7   to perform this job because he could work from home while lying in bed.  His standard work shift

8   was from 1:00 to 7:00 P.M.  He received a 30 minute lunch break and was also allowed 4 and1/2

9   minute breaks every two hours.  AR 91-92.  He did not have to work for more than two hours

10  straight at any time. Mr. Cismaru earned sufficient income from this part-time work to no longer

11  qualify for disability benefits after February 11, 2012—hence the decision to amend his

12  application to a closed period of disability from April 26, 2010 to February 11, 2012.

13      **1.**    **Medical Records.**

14      Mr. Cismaru was initially seen by Robert King, M.D. at Lubbock Sports Medicine

15  Associates on September 28, 2005.  Mr. Cismaru reported that he had experienced pain and

16  discomfort in his left knee for approximately two years "with a significant crescendo over the last

17  two months."  AR 325.  He had difficulty with flexion and rotation of the knee.  An MRI scan

18  demonstrated evidence of a torn medial meniscus.  AR 325.  Dr. King performed arthroscopic

19  surgery on the left knee on November 10, 2005 during which multiple osteocartilaginous loose

20  bodies were removed and chondroplasty of the medial femoral condyle, debridement of the lateral

21  patella facet and excision of the medial shelf plica were performed.  AR 323, 313-315.

22      On December 5, 2005 Mr. Cismaru reported the "sudden onset of increased pain and

23  discomfort in his contralateral (i.e., right) lower extremity."  Dr. King noted that "[t]he patient

24  now is having pain and discomfort in the right knee but denies any history of popping and

25  catching. There has been a sense of swelling."  An MRI scan indicated a possible torn medial

26  meniscus.  Dr. King noted that the incisional scars on the left knee were well healed and range of

27  motion appeared virtually full.  There was still some quadriceps atrophy.  Mr. Cismaru reported

28  that he was able to bear full weight on the left leg, but was shielding his right leg.  AR 322.  Dr.

1    King placed Mr. Cismaru on medication, physical therapy and exercise for his right knee

2    symptoms.  AR 320-321.  Although there was improvement in his symptoms, he continued to

3    experience "popping" and had pain when he ambulated more than 30 minutes.  AR 308.  Dr.

4    King performed arthroscopic surgery on Mr. Cismaru's right knee on January 12, 2006.  The

5    surgery included "chondroplasty with microfracture of the medial femoral condyle with

6    chondroplasty central raphe of patellar restrosurface with excision of medial shelf plica."  AR

7    311.

8         Dr. King saw Mr. Cismaru in follow-up from January 18, 2006 through July 10, 2006.

9    On July 10, 2006, he noted that Mr. Cismaru continued to improve symptomatically, but that

10   there was some sense of swelling in the latter part of the day when he was on his feet for an

11   extended period of time.  Mr. Cismaru had lost approximately 15 pounds and was actively

12   participating in a rehabilitation program for his quadriceps and hamstrings.  He was "quite

13   pleased with his progress" although he had some inexplicable transient pain in the left knee

14   during the twelve hours preceding his appointment.  AR 317.  Although Dr. King stated that he

15   would see Mr. Cismaru in follow-up, there is no record that he returned to Dr. King after July 10,

16   2006.

17        On November 23, 2010, Mr. Cismaru was seen in Las Vegas, Nevada by San Tran, M.D.

18   Mr. Cismaru reported that he had had two knee surgeries due to being overweight, but had lost

19   weight and felt better.  He had recently put weight back on and complained of bilateral knee pain.

20   He also stated that he had insomnia and type 2 herpes.  AR 346.  Mr. Cismaru's weight was listed

21   at 253 pounds.  Physical examination findings were normal, including normal range of motion in

22   the back.  Dr. Tran prescribed pain medication for joint pain and Ambien for insomnia.  AR 346.

23        Mr. Cismaru was seen at UMC Quick Care on February 26, 2011 for a complaint of not

24   sleeping well and being out of Ambien.  AR 351.  He returned to Dr. Tran on May 12, 2011,

25   stating that his left leg was puffy, slightly cold and occasionally felt tingly.  Mr. Cismaru denied

26   back pain or upper leg pain.  He stated that he was told four years earlier that he had sciatic nerve

27   damage, that his left leg would fall asleep, but this improved by losing weight and stretching.

28   Physical examination findings were normal.  However, due to concerns of possible

4

thrombophlebitis, Dr. Tran suggested that Mr. Cismaru go to the hospital emergency room for evaluation/ultrasound to rule out deep vein thrombosis (DVT). AR 344-345. Mr. Cismaru was thereafter seen at the Southern Hills Hospital on May 12, 2011 for complaints of left lower extremity pain, swelling, numbness and tingling. The physician noted that the patient's pain level was 6/10 and he had trouble walking. There was normal range of motion in the extremities, and no lower extremity edema. There was tenderness and swelling of the left knee. No evidence of deep vein thrombosis was found. AR 326-331.

Mr. Cismaru saw Dr. Tran on May 20, 2011 at which time he reported no symptoms. AR 341. He saw Dr. Tran again on June 17, 2011. Mr. Cismaru reported that he had seen a doctor in Washington state who told him to wear compression stockings. He stated that his leg swelling would come and go. It seemed to go away with rest. He had no pain with movement, but it hurt to sit. Mr. Cismaru reported approximately 3 episodes in the last month. AR 333-334. Mr. Cismaru saw Dr. Tran on June 30, 2011 for lab results all of which were reported as normal. AR 332. He was thereafter seen at UMC Quick Care on July 25, 2011 for complaints of fluid build-up in his legs for the past six weeks. He also reported a warming, burning sensation in his left leg. AR 354. He was seen at UMC Primary Care on August 23, 2011, complaining of left leg swelling which he reported having for the past 4 months. AR 356.

Following Mr. Cismaru's September 19, 2011 application for disability benefits, the Bureau of Disability Adjudication referred him to Dr. Wenceslao Cabaluna for a medical examination on December 14, 2011. After summarizing Mr. Cismaru's prior history of knee surgeries, he noted that Mr. Cismaru "has intermittent edema and tingling sensation from the bottom of the left foot to his hip and inability to distinguish between hot and cold since 2009." AR 359. Mr. Cismaru stated that he stopped driving in 2009 and that his ex-wife drove him to the medical appointment. Dr. Cabaluna noted that Mr. Cismaru walked in using a cane. AR 360. Mr. Cismaru was morbidly obese, properly dressed, coherent, oriented to time, place, person and purpose of visit, alert, comfortable and cooperative. He weighed 268 lbs. AR 361. Mr. Cismaru's knees did not appear to be swollen and there was no tenderness, crepitation, instability or patellar subluxation. There was mild pitting edema of both legs. Examination of the back and

spine revealed no evidence of scoliosis, or paravertebral muscle tenderness or spasms. Straight

leg raising while in the supine position was negative at 45 degrees on both sides. Straight leg

raising from the sitting position was also negative on both sides and there was no evidence of

sciatica. Mr. Cismaru stated that he had been using a cane since December 27, 2005 to relieve

pain on his right knee with normal weight bearing and normal posture. There was no evidence of

foot drop or shuffling. AR 362. Dr. Cabaluna noted that Mr. Cismaru got on and off the

examination table slowly. "He declin[ed] to tandem walk, to toe, to heal walk and squat. He

does not need to use any assistive device for short distances and level surface." Dr. Cabaluna

stated that Mr. Cismaru's behavior during the examination was appropriate. He was able to relate

to the doctor, understand and follow instructions. His memory and ability to concentrate also

appeared to be intact. AR 363.

Dr. Cabaluna completed a residual functional capacity checklist. He stated that Mr.

Cismaru could occassionaly lift 50 pounds and frequently lift 25 pounds. He could stand and/or

walk at least two hours in an eight hour workday and could sit six hours in an eight hour

workday. Standard breaks and lunch period would accommodate Mr. Cismaru's need to

alternatively stand or sit and allow him to work eight hours. Mr. Cismaru could frequently climb

ramps and stairs, balance, stoop, bend, kneel and crawl. He could occasionally climb ladders or

scaffolds and crouch or squat. He had no limitations for reaching, fingering, handling objects,

hearing, seeing, speaking or traveling. He also had no environmental limitations. AR 366-367.

Mr. Cismaru returned to Dr. Tran on May 4, 2012 to get a referral for a DVT Scan and an

MRI. Under "History of Present Illness," Dr. Tran stated:

> A 51 y/o obese Caucasion (sic) male comes in for re-evaluation of
> his leg swelling. He states "My edema isn't going away in my leg."
> Has been gaining and loosing (sic) a lot of weight over the past
> year. I haven't been following recommendations with salt, calories,
> diet and exercise recommendation. He feels that he is eating and
> drinking "all the time."

. . .

. . .

. . .

6

> The swelling as (sic) been in the legs has been ongoing for the last year.  Left is more worse than the right.  The left leg feels "weird"; a warming sensation, circumferential "warm feeling" about mid shin down.  No pains, but has notices (sic) "pins and needles".  Constant feeling in the legs, Left greater than Right.

AR 483.

On examination, Dr. Tran noted that Mr. Cismaru's extremities were intact, there was good tone/bulk, and minimal edema without pitting.  Mr. Cismaru's back was "symmetrical, spine midline, no CVA tenderness.  Muscululoskeletal good tone/bulk, 5/5 strength."  AR 483.  Dr. Tran prescribed medication and scheduled Plaintiff for follow-up in two to three weeks.  AR 484.

Mr. Cismaru presented to Dr. Tran on May 15, 2012 with complaints of fatigue and malaise, and urinary urgency and frequency.  Dr. Tran noted that he had full range of motion in the extremities; there was no clubbing or edema.  Mr. Cismaru's spine was straight, there was no CVA tenderness, no paraspinous tenderness; and there was Muscululoskeletal full range of motion.  AR 481.  On June 20, 2012, Mr. Cismaru presented to Dr. Tran complaining of right sided lower back pain for the past two weeks.  He reported "right lower rib pain especially when he wakes up in the morning.  pain is sharp and worsening with movements and coughing.  He has no nausea or vomiting."  On examination there was no CVA tenderness or paraspinous tenderness.  Dr. Tran provided Plaintiff with a referral to a neurologist.  AR 474.

Mr. Cismaru was seen by Dr. Richard Shehane at the Nevada Heart & Vascular Center on May 23, 2012 for cardiac consultation.  Dr. Shehane stated that Mr. Cismaru was negative for deep vein thrombosis, but he was suspicious that he might have venous insufficiency or a neuropathy because he had abnormal sensation in the left lower extremity.  He scheduled Mr. Cismaru for follow-up tests.  AR 403.  The tests were negative for cardiac related problems.  AR 396-399.  Mr. Cismaru was subsequently diagnosed on July 3, 2012 with venous insufficiency.  AR 391.

An MRI scan of Mr. Cismaru's lumbar spine was performed on August 14, 2012.  The MRI revealed lumbar spondylosis with multilevel degenerative disc disease at L2-3, L3-4, L4-5, and L5-S1.  The overall impression was severe narrowing of the spinal canal at L2-3; moderate to

severe narrowing at L3-4; multilevel neural foramina narrowing most markedly at L3-4 and L4-5; and encroachment of multilevel exiting nerve roots.  AR 406-407.

Mr. Cismaru was seen by Dr. Yevgeniy Khavkin on August 14, 2012.  Mr. Cismaru's chief complaint was numbness in the bottom of his left foot.  He reported that the symptoms began a few months ago.  He denied any pain in his low back or in his lower extremities. Physical examination of the lumbar spine revealed full range of motion on forward flexion, extension, lateral flexion and rotation.  There was 5/5 motor strength of the lower extremities. Mr. Cismaru's sensation to light touch was grossly intact throughout his right lower extremity, but he reported decreased sensation to light touch on the lateral aspect and bottom of the left foot. His deep tendon reflexes were 1+ throughout and there was no evidence of hyperflexia or pathological reflexes.  Dr. Khavkin noted the results of the MRI.  He had an extensive discussion with Mr. Cismaru about the pros and cons of conservative versus surgical treatment and the benefits and risks of surgery.  Mr. Cismaru expressed the wish to proceed with surgery.  AR 458.

On September 19, 2012, Dr. Khavkin performed lumbar spine surgery on Mr. Cismaru which included laminectomies with bilateral facetectomies and foraminotomies at L2-3, L3-4, and L4-5.  The surgery reportedly went well and Mr. Cismaru was discharged from the hospital on September 21, 2012.  AR 408-427.  Dr. Khavkin saw him in follow-up on September 27, 2012 at which time Mr. Cismaru reported improvement in the amount of numbness that he had prior to surgery.  AR 455.  Dr. Khavkin again saw Mr. Cismaru on October 16, 2012 at which time he noted that Mr. Cismaru had traveled to Hawaii and had noticed an oozing from the incision site on his return.  AR 453.

Mr. Cismaru underwent an MRI of his cervical spine on October 25, 2012 based on a clinical history of neck pain.  AR 437-441.  It is unclear from the records, however, when Plaintiff first complained of neck pain.  The MRI revealed a disc bulge and indentation of the spinal cord at C5-6, moderate stenosis with probable impingement on the exiting C4 nerve root, moderate stenosis with probable impingement at C4-5, and severe stenosis with probable impingement on the existing C6 nerve root.  AR 437-438.

. . .

1    On November 8, 2012, Dr. Khavkin noted that Mr. Cismaru "continues to complain of
2    pain in his neck and had 5/5 strength with bilateral Hoffman's and evidence of hyperflexia." The
3    lumbar MRI demonstrated post-operative changes and it was difficult to assess the degree of
4    relief of the lumbar stenosis considering recent surgery and infection. AR 454. Dr. Khavkin
5    noted that the MRI of the cervical spine demonstrated degenerative changes most prominent at
6    C5-6 with loss of the cervical lordosis and the disc osteophyte complex causing severe cervical
7    stenosis with associated spinal cord signal abnormality. Dr. Khavkin advised Mr. Cismaru that
8    the presence of severe cervical stenosis put him at high risk of potential spinal cord injury. He
9    recommended that Mr. Cismaru undergo decompression and fusion surgery at C5-6. AR 454.
10   This surgery was performed on December 12, 2012. AR 501-504. Dr. Khavkin saw Plaintiff for
11   post surgical follow-up on December 27, 2012 at which time he reported that "overall he is
12   making good recovery." AR 511.

13   On November 29, 2012, following the lumbar spine surgery but prior to the cervical spine
14   surgery, Dr. Khavkin completed a medical questionnaire in which he stated that Mr. Cismaru's
15   medical condition meets the Listed Criteria at 1.04.(A). He also stated that Mr. Cismaru was not
16   able to perform any type of full time employment. Dr. Khavkin did not provide an opinion as to
17   when Plaintiff's condition became disabling.

18       **2.    Disability Reports, Supporting Witness Statements and Hearing Testimony.**

19   In an undated Disability Report, that was apparently submitted shortly after Mr. Cismaru
20   filed his application, he stated that the following conditions limited his ability to work:
21   musculoskeletal impairments, pain-neuropathy in legs; arthritis in both lower extremities; edema
22   in both lower extremities, congestive heart failure; morbid obesity; unable to sustain reasonable
23   walking pace; and knee problems. AR 244. He further stated that he could no longer sustain a
24   reasonable walking pace, and could not climb or descend more than ten steps at a time. AR 255.

25   Plaintiff's mother, Pearl Klein Cismaru, provided a written affidavit dated December 10,
26   2012. Mrs. Cismaru, who resides in Lubbock, Texas, stated that she saw her son on a daily basis
27   until he moved to Las Vegas in 2009. She stated that following his second knee surgery in
28   January 2006, Plaintiff fell while climbing stairs. She believed that was the start of his

subsequent problems as "[h]e never again truly functioned at full speed" and "[o]ver time, his physical problems became progressively worse." AR 299. Mrs. Cismaru stated that a trusted employee took over the running of Plaintiff's business, but it did not function properly and Plaintiff sold it and moved to Las Vegas. Mrs. Cismaru noted that Plaintiff was subsequently employed as a customer service representative, but was fired "for missing too much work time caused by chronic leg pain." Mrs. Cismaru also summarized her knowledge of Plaintiff's current or ongoing medical problems. AR 299.

Mr. Cismaru's ex-wife, Maryia Melnikava provided a written statement dated December 18, 2012. Ms. Melnikava stated that she was with Mr. Cismaru on a daily basis from May 2008 until their divorce in 2011. Following the divorce, she continued to see him one to two times a week and ran most of his errands for him. Ms. Melnikava also stated that Mr. Cismaru was fired from his job as telephone customer service representative because he missed too much work due to his chronic leg pain. Ms. Melnikava described Mr. Cismaru's physical limitations due to chronic pain, fatigue, depression and anxiety. She noted that he lives in a 2 story house and that it takes him eight to ten minutes to climb the stairs. She purchased an inflatable mattress so that he could live downstairs. Mr. Cismaru could not walk more than 10-12 minutes without needing to lie down and rest. He also had difficulty sleeping and was therefore tired throughout the day. She stated: "Over the last 3+ years, I have taken David to numerous physicians and specialists who have put him on different medications and therapies to no avail. Nothing medical has provided any meaningful relief and his ability to function on a daily basis as a normal person is diminished." Ms. Melnikava assisted Mr. Cismaru by setting up automatic bill payments so that he did not have to go to the mailbox, doing all of the driving for him, and running errands for him once a week. She also moved back in with him for a week following his back surgery so that she could change his bandages. Ms. Melnikava stated that "David has more 'bad' days than 'good' ones, I describe a bad day as not getting off the bed or couch for any real length of time. His breathing is a big concern for me. No normal person should be 'out of breath' from walking up one flight of stairs in our home. His chronic pain and exhaustion is one of the factors that led to our divorce. It is easier for me to assist David once a week, rather than 24 hours a day. Our

1    divorce was amicable."   AR 300.

2        At the hearing on January 9, 2013, Mr. Cismaru testified that during the closed period,

3    April 25, 2010 to February 11, 2012, he had extreme pain in both knees which prevented him

4    from working.  He also stated that the numbness in the lower left leg prevented him from

5    working.  He was almost always in constant, chronic pain from the buttocks down.  AR 92-93.

6    The ALJ asked Mr. Cismaru when the pain from his buttocks on down started and he responded

7    "about a year and half ago."  AR 93.  Mr. Cismaru testified that he uses a cane to assist him in

8    going up and downstairs and in getting up from a seated position.  He did not use it to walk.  AR

9    94.  During the closed period he did not drive an automobile.  He generally laid on the couch or

10   in bed all day.  He did not do any chores.  His ex-wife would come over and take care of him

11   which she continued to do up to the time of the hearing.  AR 96-97.  He did not go to the store or

12   out for social activities.  He attended only one movie in the three years prior to the hearing.  He

13   stated that he could comfortably stand for only five to ten minutes and he could only sit for five to

14   ten minutes before needing to stand.  AR 97.  Mr. Cismaru estimated that during an eight hour

15   workday, he would be able to sit five to ten minutes per hour before needing to stand.  He could

16   only stand for one hour out of an eight hour day.  AR 98.

17       Mr. Cismaru's counsel asked him what happened after he stopped working in April 2010.

18   He stated: "It wasn't just the knees and the arthritis and the arthroscopic surgeries.  I still had, I

19   guess for lack of a better word, chronic pain, ongoing pain regarding my lower back, regarding

20   specifically my left leg.  The only problem was, what can you do?  I mean, you don't have

21   insurance, you don't have any way to get to a doctor, you just kind of live with the pain and hope

22   for the best."  AR 99.  He testified that during 2011 he developed numbness from the left knee

23   down.  He could not distinguish hot or cold sensation in that leg.  He believed these problems

24   began in April 2010.  AR 100.   Mr. Cismaru also testified that once the MRI of his lower back

25   was performed it made sense to him "because it was never just the knees back in April of 2010.

26   I've always had problems with my back.  AR 105.  Mr. Cismaru testified, that in the beginning

27   the "pain" in left leg was confined to the knee down.  It gradually migrated up to the buttocks.

28   AR 106.

1    The vocational expert, Dr. Robin Genereaux, testified that Mr. Cismaru's prior occupation

2    as a business manager was light work and his previous job as a customer service representative

3    was sedentary work.  AR 107.  His current work as an order clerk or customer service

4    representative also qualified as sedentary work.  AR 108.   The ALJ asked the vocational expert

5    to assume a hypothetical person of the same age, education and experience as Mr. Cismaru.  The

6    hypothetical person was "capable of working at a medium exertional level," but could only stand

7    or walk a total of two hours in an eight hour work day, and could not crawl, climb ropes, ladders

8    or scaffolds and could only occasionally crouch or kneel.  The ALJ asked whether this

9    hypothetical person could perform any of Plaintiff's past relevant work.  Dr. Genereaux testified

10   that the person would not be able to perform Mr. Cismaru's past work as a business manager, but

11   could work as a customer service representative and could also perform his current work as an

12   order clerk.  AR 109-110.  Dr. Genereaux testified that there were other sedentary jobs available

13   in the national and Nevada economies that Mr. Cismaru could perform, including information

14   clerk, interviewer, and general office clerk.  AR 110-111.

15   Plaintiff's counsel asked Dr. Genereaux to assume a hypothetical person who was limited

16   to standing for five to ten minutes at a time, with total standing of one hour in an eight hour day;

17   who was limited to sitting five to ten minutes at a time, with total sitting of one hour in an eight

18   hour day; and who could walk five to ten minutes at a time, with total walking of one hour in an

19   eight hour day.   He asked whether such a person would be able to perform any of Mr. Cismaru's

20   prior work or the other sedentary jobs that she identified.  Dr. Genereaux stated that such

21   limitations would place the person below the sedentary work level.  AR 112.

22   **C.    Administrative Law Judge's February 20, 2013 Decision.**

23   The ALJ applied the five-step sequential evaluation process established by the Social

24   Security Administration in determining whether Plaintiff was disabled.  AR 47-49.  The ALJ

25   found that Plaintiff met the insured status requirements of the Social Security Act through

26   December 31, 2010 and that he had not engaged in substantial gainful activity since April 25,

27   2010, the alleged onset date of his disability.  AR 48.  At step two of the evaluation process, the

28   ALJ found that Plaintiff had the following severe impairments: degenerative joint disease of the

knee, mild axonal neuropathy of the left lower extremity, and obesity. The ALJ stated:

> Although [Mr. Cismaru] had neck and lumbar surgery in late 2012, there is no convincing evidence based on the objective records that disorders of the back were a severe impairment during the requested closed period. Counsel notes that the claimant's neck and back pain did not occur overnight. I do agree. However, I am severely limited by the objective evidence, which fails to record any significant complaints or limitations stemming from the claimant's neck and back during the period at issue.

AR 49.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). AR 49. In regard to this finding, the ALJ stated the the claimant had not specifically alleged and the ALJ did not find that Plaintiff had an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. AR 49.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except that he may never crawl or climb ladders, ropes, or scaffolds and he may only occasionally crouch. The Plaintiff was limited to standing and/or walking 2 hours in an 8 hour workday. AR 49. Based on this residual functional capacity, the ALJ found at step four that Plaintiff was capable of performing his past relevant work as a customer service representative and order clerk which are sedentary occupations. AR 53. He also found at step five that Plaintiff was capable of performing other sedentary work available in the national and local economy as identified by the vocational expert. AR 54-55. The ALJ found that Plaintiff had not been under a disability from April 25, 2010 through the date of his decision. AR 55.

In reaching his conclusion that Mr. Cismaru had the residual functional capacity to perform medium work, the ALJ first summarized the written statements of Plaintiff's mother and ex-wife. AR 50-51. The ALJ gave little weight to their opinions regarding the severity of Mr. Cismaru's physical limitations that allegedly precluded him from working. The ALJ stated:

1
2
3
4
5

> Both are interested parties advocating for the claimant. The objective medical evidence does not support the extreme limitations described by Ms. Klein Cismaru and Ms. Melnikava. Additionally, both statements were given subsequent to the end of the closed period of disability. Therefore, both statements take the claimant's back impairment into account. For reasons already explained, I cannot consider the claimant's back impairment as there is no objective evidence to support it. For that reason, I cannot credit Ms. Klein Cismaru's and Ms. Melnikava's opinion.

6    AR 51.

7    The ALJ also found that Plaintiff's statements concerning the intensity, persistence, and

8    limiting effects of his symptoms were not credible to the extent they were inconsistent with the

9    residual functional capacity determined by the ALJ because they were not supported by the

10   objective medical signs and findings of the record as a whole. AR 51. In support of this finding,

11   the ALJ discussed the medical records regarding Plaintiff's examinations at Southern Hills

12   Hospital on May 12, 2011. AR 51. The ALJ also discussed Dr. Cabaluna's report regarding his

13   December 4, 2011 examination of Mr. Cismaru and his findings regarding Plaintiff's residual

14   functional capacity. AR 51-52. The ALJ gave Dr. Cabaluna's opinion some weight. He rejected

15   Dr. Cabaluna's finding that Plaintiff could climb ladders, ropes or scaffolds, and that he could

16   crawl. The ALJ stated that Plaintiff's knee pain would prevent him from engaging in these

17   activities. He found, however, that Plaintiff could occasionally crouch and could frequently

18   climb ramps and stairs, balance, stoop, and kneel as range of motion of both knees was normal

19   and no mechanical deficit was noted. He also found that Plaintiff had no significant lifting and/or

20   carrying or sitting restrictions. AR 52.

21   The ALJ reiterated that there was no objective evidence of a neck or back impairment

22   prior to the end of the requested period of disability. AR 52. He noted the August 12, 2012 MRI

23   findings as well as the post lumbar surgery MRI findings and the cervical spine MRI findings on

24   October 25, 2012. AR 52. The ALJ also discussed Dr. Khavkin's December 6, 2012

25   questionnaire response in which he stated that Plaintiff meets Listing 1.04(A) and that Plaintiff

26   could not sustain any full time employment on a consistent basis. AR 53. The ALJ gave little

27   weight to Dr. Khavkin's opinion. He again stated that there was no evidence of a neck or low

28   back impairment prior to the end of the requested period of disability. The ALJ noted that Dr.

14

1

2

3

Cabaluna's examination of Plaintiff's back in December 2011 was normal with no paravertebral tenderness or spasm, and that cervical and lumbar range of motion was within normal limits.  AR 53.  The ALJ concluded:

4

5

6

7

8

> The evidence presented prior to the end of the requested closed period of disability did not establish any lumbar or cervical impairment.  The evidence that was presented was approximately eight months from the end of the requested closed period of disability.  This is plenty of time for the claimant to develop a severe cervical and lumbar impairment.  In the absence of any evidence of a lumbar or cervical impairment prior to the end of the closed period of disability, I cannot consider those impairments when making my decision.

9

AR 53.

## DISCUSSION

10

11

### I.    Standard of Review

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both adverse and supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision.  *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision.  *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

28

1  It is incumbent on the ALJ to make specific findings so that the court need not speculate

2  as to the findings.  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981), citing *Baerga v.*

3  *Richardson*, 500 F.2d 309 (3rd Cir. 1974).  In order to enable the court to properly determine

4  whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings

5  "should be as comprehensive and analytical as feasible and, where appropriate, should include a

6  statement of subordinate factual foundations on which the ultimate factual conclusions are

7  based."  *Lewin*, 654 F.2d at 635.

8  In reviewing the administrative decision, the District Court has the power to enter "a

9  judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

10  with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In the alternative, the

11  District Court "may at any time order additional evidence to be taken before the Commissioner of

12  Social Security, but only upon a showing that there is new evidence which is material and that

13  there is good cause for the failure to incorporate such evidence into the record in a prior

14  proceeding."  *Id.*

15  **II.  Disability Evaluation Process**

16  To qualify for disability benefits under the Social Security Act, a claimant must show that

17  (a) he suffers from a medically determinable physical or mental impairment that can be expected

18  to result in death or that has lasted or can be expected to last for a continuous period of not less

19  that twelve months; and (b) the impairment renders the claimant incapable of performing the

20  work that the claimant previously performed and incapable of performing any other substantial

21  gainful employment that exists in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098

22  (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of

23  proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S.

24  1122 (1996).  If the claimant establishes an inability to perform his or her prior work, the burden

25  shifts to the Commissioner to show that the claimant can perform a significant number of other

26  jobs that exist in the national economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir.

27  2007).  Social Security disability claims are evaluated under a five-step sequential evaluation

28  procedure which the ALJ followed in this case and which the Court has summarized above.  *See*

20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).

**III.    Whether the ALJ Erred in Finding that Plaintiff Was Not Disabled During the Closed Period from April 25, 2010 to February 11, 2012.**

It is undisputed that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010.  AR 48.  Plaintiff's disability must therefore have begun on or before December 31, 2010 in order for him to be eligible for disability benefits.  *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1458 (9th Cir. 1995); *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008), citing 42 U.S.C. § 416(i); and *Bird v. Commissioner of Social Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012).  Plaintiff also stipulated to an ending date of February 11, 2012 for his application because he earned sufficient income after that date to no longer be eligible for disability benefits.

Plaintiff challenges the ALJ's determinations prior to and at step four of the sequential process that he had the residual functional capacity to perform medium level work with certain limitations and was therefore capable of performing his past work as a customer service representative or order clerk.  Plaintiff argues that the ALJ failed to set forth sufficient grounds to reject his testimony that the severity of his knee and back symptoms prevented him from working during the closed period from April 25, 2010 to February 11, 2012.

The ALJ's decision was based in part on his finding that there was "no convincing evidence based on the objective records that disorders of the back were a severe impairment during the requested closed period."  He also stated that he was "severely limited by the objective evidence, which fails to record any significant complaints or limitations stemming from the claimant's neck and back during the period at issue."  AR 49.  This statement was clearly correct with respect to Plaintiff's neck pain or other neck symptoms.  There was no report of neck pain in the medical records until October 25, 2012.  Dr. Khavkin recommended cervical decompression and fusion surgery to Mr. Cismaru on November 8, 2012 because the severe cervical stenosis at C5-6 placed him at high risk of potential spinal cord injury.  There is no indication that the surgery was recommended because Plaintiff was experiencing severe or intolerable neck pain or other symptoms.  Moreover, Plaintiff did not list neck pain as a disabling condition in his

1    disability report or hearing testimony.  AR 244, 99.

2         The record is not so clear, however, with respect to Plaintiff's lumbar spine condition.

3    There are no medical records for the period after July 10, 2006 (six months after Plaintiff's second

4    knee surgery) and November 23, 2010 when he saw Dr. Tran.  AR 346.  Plaintiff's explanation for

5    this lack of medical care was that he became uninsured (it is not clear when) and was therefore

6    unable to obtain medical treatment.  AR 99.  On May 12, 2011, Plaintiff reported to Dr. Tran that

7    his left leg was puffy, slightly cold and occasionally felt tingly.  AR 344.  Plaintiff again

8    complained of leg swelling and pain to Dr. Tran on June 17, 2011.  AR 333-334.  On July 25,

9    2011, he reported to UMC Quick Care that he had a warm, burning sensation in his left leg.  AR

10   354.  Plaintiff told Dr. Cabaluna on December14, 2011 that he had intermittent edema and a

11   tingling sensation from the bottom of his left foot to his hip and had been unable to distinguish hot

12   and cold since 2009.  AR 359.  These complaints all occurred prior to expiration of the closed

13   period on February 11, 2012.  Plaintiff continued to complain of similar symptoms on and after

14   May 4, 2012 up through the lumbar spine surgery in September 2012.[2]

15        Plaintiff returned to Dr. Tran on May 4, 2012, at which time he again complained of leg

16   swelling which had been going on for the past year, a "weird" feeling in the left leg, a warm feeling

17   from the mid shin on down and "pins and needles" in the leg.  AR 483.  Plaintiff's physicians

18   attempted to diagnose the cause of his symptoms.  A deep vein thrombosis was ruled out.  In

19   August, 2012, however, an MRI of Plaintiff's lumbar spine revealed degenerative disc disease at

20   multiple levels.  On August 14, 2012, Dr. Khavkin noted that Plaintiff's chief complaint was

21   numbness in the bottom of his left foot.  Plaintiff elected on that date to proceed with lumbar spine

22   surgery which was performed on September 19, 2012.  AR 458, 408-427.  The medical records

23   therefore show that Plaintiff experienced left leg symptoms prior to the expiration of the closed

24   period that reasonably could have been caused by impingement of nerve roots in his lumbar spine.

25   The ALJ's statement that there was no objective evidence of a back impairment prior to the end of

26   _____

27        [2]The only medical visit that occurred during the alleged period of disability and prior to the
     expiration of Plaintiff's insured status, was on November 23, 2010.  On that date, Plaintiff complained of

28   bilateral knee pain.  He did not complain of leg numbness, tingling or burning sensations.  AR 346.

1    the requested period of disability is therefore contrary to the medical records.

2         A medical impairment may be found not severe at step two of the sequential process "*only if*

3    the evidence establishes a slight abnormality that has no more than a minimal effect on an

4    individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). *Webb* also

5    states that an ALJ has an affirmative duty to supplement the claimant's medical record where the

6    evidence regarding the existence of a severe impairment is ambiguous. *Id.*, citing *Tonapetyan v.*

7    *Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). Here, the medical evidence was, at minimum,

8    ambiguous as to whether Plaintiff 's lower leg symptoms were attributable to the degenerative

9    conditions in his lumbar spine prior to February 12, 2012. If the ALJ was not persuaded that

10   Plaintiff exhibited a lumbar spine impairment during the closed period of disability, then he should

11   have procured an appropriate expert medical opinion on the issue, or given Plaintiff the opportunity

12   to present such additional evidence.

13        This does not mean, however, that Plaintiff's lumbar spine condition was disabling prior to

14   February 11, 2012, let alone on or before December 31, 2010. Plaintiff testified that he had

15   "chronic pain, ongoing pain regarding my lower back, regarding specifically my left leg" after he

16   stopped working in April 2010. AR 99. He testified that once he had the MRI and realized he had

17   "a terrible back," he understood the cause of his pain. He stated that "it was never just the knees

18   back in April 2010. I've always had problems with my back." AR 105. Plaintiff's testimony was

19   supported by the written statements of his mother and ex-wife. AR 299, 300. Plaintiff's testimony,

20   however, was not necessarily consistent with the medical records. As indicated above, during his

21   visit with Dr. Tran on November 23, 2010, he complained only of bilateral knee pain. AR 346. On

22   May 12, 2011, he complained only of left leg swelling, numbness and tingling. He denied back pain

23   or upper leg pain. AR 344. Plaintiff did not complain of back pain during his examination by Dr.

24   Cabaluna on December 14, 2011. Dr. Cabaluna's examination findings regarding Plaintiff's back

25   were normal. AR 359-362. Plaintiff did not complain of back pain when he returned to Dr. Tran on

26   May 4, 2012. AR 483. The first documented report of low back pain appears to be on June 20,

27   2012 when Plaintiff reported right sided lower back pain for the past two weeks. AR 474.

28   Plaintiff, however, denied any pain in his low back and lower extremities when he was examined by

19

1    Dr. Khavkin on August 16, 2012.  AR 458.  The medical records are not persuasive that the

2    swelling, numbness or burning sensations in Plaintiff's left leg were disabling.

3            There was only one medical appointment between July 2006 and December 31, 2010 when

4    Plaintiff's insured status expired.  This might suggest the absence of serious physical or medical

5    symptoms during that period.  Plaintiff testified, however, that he was unable to obtain  medical

6    treatment due to a lack of insurance.  This can be a reasonable explanation for the failure to obtain

7    medical treatment.  *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007).  The ALJ did not inquire

8    about the time period during which Plaintiff did not have medical insurance, or further develop the

9    record as to why he did not obtain medical treatment during this period.

10           Plaintiff primarily attacks the ALJ's decision on the grounds that he did not provide

11   adequate reasons to reject the credibility of his testimony regarding the severity of his pain and other

12   symptoms.  As Plaintiff notes, the only statement made by the ALJ with respect to Plaintiff's

13   credibility was as follows:

14              The claimant's statements concerning the intensity, persistence, and
                limiting effects of his symptoms were not credible to the extent that
15              they were inconsistent with the above residual functional capacity
                assessment, because they were not supported by objective medical
16              signs and findings of the record as a whole under SSR 96-7p.

17           AR 51.

18           In the absence affirmative evidence showing that the claimant is malingering, the ALJ's

19   reasons for rejecting the credibility of the claimant's testimony regarding the severity of his pain or

20   other symptoms must be clear and convincing.  The ALJ must state the reasons why the testimony is

21   unpersuasive and specifically identify what testimony or evidence undermines the claimant's

22   complaints.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (2009); *Morgan v.*

23   *Comm'r of Soc. Sec. Admin.,* 169 F. 3d 595, 599 (9th Cir. 1999).  If the claimant produces objective

24   medical evidence of an underlying impairment, the ALJ may not reject his subjective complaints

25   solely on a lack of medical evidence to fully corroborate the alleged severity of his pain.  *Burch v.*

26   *Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005), citing *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th

27   Cir.1991).  Pain testimony may establish greater limitations than can medical evidence alone.  *Id.*,

28   citing SSR 96–7p (1996).

To determine credibility or the lack thereof, the ALJ may engage in ordinary techniques of credibility evaluation, such as considering the claimant's reputation for truthfulness and inconsistencies in claimant's testimony. *Burch,* 400 F.3d at 680, citing *Tonapetyan v. Halter,* 242 F.3d 1144, 1148 (9th Cir.2001). The ALJ may also consider other factors such as (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) the type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Id.*, citing *Bunnell,* 947 F.2d at 346 (quoting SSR 88–13 (1988)) (superceded by SSR 95–5p (1995)).

In *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 884-85 (9th Cir. 2006), the Court specifically rejected the type of "boilerplate" credibility finding made by the ALJ in this case. The court stated that it "is exactly the type we have previously recognized the regulations prohibit. *See* SSR 96–7p, 1996 WL 374186, at *1[.]" The court also stated that the ALJ did not provide a narrative discussion containing specific reasons for his finding, supported by the evidence in the record. The court stated that "[w]hile an ALJ may certainly find testimony not credible and disregard it as an 'unsupported, self-serving statement,' we cannot affirm such a determination unless it is supported by specific findings and reasoning." *Id.*, citing *Flaten v. Secretary of Health & Human Services, ,* 44 F.3d at 1464. The ALJ in this case also clearly failed to make a proper credibility finding as required under Ninth Circuit case law.

The ALJ decision denying Plaintiff's application of disability benefits should be reversed because (1) his determination that Plaintiff did not have a lumbar spine impairment during the closed period is not supported by the medical records and (2) he did not make a legally proper finding regarding the credibility of Plaintiff's testimony as to the severity of his symptoms during the closed period. The Court must therefore decide whether this case should be remanded for an award of disability benefits or for further proceedings on the issue of disability. In answering this question, the court must decide (1) whether the record has been fully developed such that further administrative proceedings would serve no useful purpose; (2) whether the ALJ failed to provide legally sufficient reasons for rejecting the claimant testimony or medical opinion; and (3) whether, if

improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014); *See also Varney v. Sec'y of Health and Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988). Generally, when all three conditions are met the court must remand for an award of benefits. *Garrison*, 759 F.3d 1020–21. If, however, an evaluation of the record as a whole "creates serious doubt as to whether the claimant is, in fact, disabled, then remand for further proceedings is proper. *Id.*

Based on the record as a whole, there is a serious doubt whether Mr. Cismaru was, in fact, disabled within the meaning of the Social Security Act during the closed period from April 25, 2010 through February 11, 2012. As discussed above, the medical records indicate that Plaintiff's leg symptoms did not reach a level of severity to be arguably disabling until after the expiration of his insured status on December 31, 2010. It is also debatable whether his symptoms reached that level of severity before the end of the closed period in February 2012. Accordingly,

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and Remand (#16) should be **granted**, and the Acting Commissioner's Cross-Motion to Affirm the Agency's Decision (#22, #23) be **denied**.

**IT IS FURTHER RECOMMENDED** that this matter be remanded to the Social Security Administration for further proceedings, including further hearing as necessary, to determine whether Plaintiff was disabled within the meaning of the Social Security Act during the closed period from April 25, 2010 to February 11, 2012, and, in particular, whether he became disabled on or prior to December 31, 2010, his last date of insured status.

## **NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or

appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 21st day of March, 2016

_____
GEORGE FOLEY, JR.
United States Magistrate Judge